## ABRAM M. BENTON *v.* STANLEY MARTIN.

Where a sight draft had been lost before presentation for payment, and a duplicate one had been obtained therefor of the drawer, the necessary delay in presenting the second draft for payment will be excused.

The drawer, by giving the second draft upon the assertion of the loss of the first by the plaintiff, admits its loss, and also the impossibility of its presentation for payment.

Due presentation of the second bill, with notice of protest, will bind the drawer, though thirty days may have elapsed from the time of the drawing of the lost draft.

THIS action was brought, in the Supreme Court, on a draft or bill of exchange drawn by the defendant for value received by him of the plaintiff, on Messrs. Griggs & Lathrop, of New York, for $2,026.83, payable to the order of the plaintiff at sight. The complaint set forth a presentment and a protest for non-payment, and notice to the defendant. The bill was dated the 10th July, 1857, but was actually drawn and delivered to an agent of the payee on the 10th day of August, in that year, at the defendant's place of business, at Olean, Cattaraugus county. There was written across the face of the bill, at the time of signing it, the word *duplicate*. The presentment to the drawees was made on the 14th day of August, when payment was refused, the drawees having failed the preceding day in the afternoon. Notice to the defendant was immediately given. To excuse the late presentment, it was shown that the bill was obtained of the defendant to be remitted to the Exchange Bank of Hartford, Connecticut, in order to pay a note of the plaintiff, which was held by that bank. The plaintiff resided in Pennsylvania, about twenty-six miles from Olean, and sent an agent to the defendant to procure the bill, who, before sending it to the bank at Hartford, had to procure the plaintiff's indorsement upon it. This was done, and it was mailed to Hartford on the 11th of August, which was as early as it could be done after obtaining the indorsement. The fact that it was procured to be remitted to Hartford, and the delay which

would be occasioned in getting the plaintiff's indorsement, were facts known to the defendant when he drew the bill. If it had been sent directly from Olean on the 10th, by the way of Hartford, it could have been presented for payment in New York on the 13th. With the necessary delay in obtaining the indorsement, the 14th was the earliest day on which it could be presented if sent by the way of Hartford. The plaintiff's agent swore that the defendant, when he drew the draft, requested him, the witness, to hold it over one mail; but this was denied by the defendant testifying on his own behalf, and by another witness on their recollection and belief.

The other facts, upon which the principal question arises, are the following: The plaintiff, desiring to remit funds to Hartford, to pay his note at the Exchange Bank, about the 1st of July, 1857, applied to the defendant and obtained a sight draft on Griggs & Lathrop for the same amount as the one above mentioned, post dated the 10th of July, and sent it to be collected and applied. The plaintiff, as a witness on his own behalf, swore that he sent it to the Exchange Bank for that purpose, and received an answer by letter that the bank would collect it and apply it to the payment of his note. Subsequently, on the 14th day of July, the plaintiff again wrote to the bank concerning the draft; but this letter was not produced or its contents shown. A letter, in answer, from the cashier of the bank to the plaintiff, of the date of 17th July, was given in evidence, in which surprise was expressed that the plaintiff had not received the draft of defendant in his, the cashier's, former letter, which the writer said he was confident he had inclosed in it, as he had it before him when he was writing; and he asks the plaintiff if the letter had any appearance of having been opened and sealed up again, and desires him to get a duplicate from the drawer and send it to him; and it was in consequence of this suggestion that the draft sued on was applied for and obtained. There was no claim that the draft first given had ever been presented for payment. The plaintiff swore that it was not inclosed in the letter which he received from the

cashier, and that he had never seen it since he sent it to Hartford, and that his letter to the cashier of the 14th July was written in consequence of not receiving the draft.

It appeared that the draft sued on was given in consequence of the former one being supposed to be lost. The defendant testified that he had on two occasions before the draft in suit was drawn offered to give the plaintiff a duplicate on account of the supposed loss. The plaintiff then appeared to think that the bank still had the former draft and that they could present it. The defendant swore that his account with Griggs & Lathrop had been good at all times from the drawing of the first draft, and that when they suspended they owed him over four thousand dollars.

A witness for the plaintiff, who was his indorser on the note at the Exchange Bank, testified that on the 16th August the defendant told him that he had heard of the failure of Griggs and Lathrop, and that he thought it likely that the plaintiff's draft would be protested, and if so he would pay it when he came back from New York, whither he was then going.

The court, on the motion of the defendant's counsel, nonsuited the plaintiff, whose counsel insisted upon his right to have the case submitted to the jury. The plaintiff's counsel thereupon excepted. The appeal here is brought from the judgment of the General Term affirming that rendered upon the nonsuit.

*A. G. Rice*, for the appellant.

*E. Peshine Smith*, for the respondent.

DENIO, Ch. J. Assuming the paper upon which the action is brought to be operative as an independent bill, it was presented with legal diligence, and the defendant was duly charged. The omission to forward it on the very day it was received, if that had been essential, was excused by the necessity of procuring the indorsement of the plaintiff, which the defendant knew, when he drew the draft, was requisite to be done. The defendant moreover knew, when he drew it,

that it was drawn for the purpose of being remitted to Hart-
ford, and he cannot complain of the delay which that would
occasion. Besides, the plaintiff proved by one witness that
a delay of one day in forwarding it was requested by the
defendant, and though that was contradicted, it presented a
question for the jury, if the fact was material. But I do not
understand that the plaintiff was obliged to forward it on the
very day he received it. If it had been sent the next day,
laches would not be imputable to the plaintiff. (Chitty on
Bills, 420, Spring. ed., 1839.) The Supreme Court found
no difficulty in this part of the case. The opinion declares
that the presentment was in season, and, impliedly, that
the plaintiff would have been entitled to recover, but for
the connection of the bill with the former one drawn in the
preceding month.

The nonsuit was sustained on the position that the defend-
ant was entitled to the same defense as though the action had
been brought on the first draft. Then, inasmuch as there
had been a delay of more than thirty days in presenting that
draft, which was not excused, during which time the drawees
had failed, the plaintiff, upon familiar principles, had lost his
right to resort to the drawer. I do not concur in that view
of the case. The draft sued on was given on the assumption
by both the parties that the former one had, before present-
ment, been lost, so that the plaintiff was unable to avail him-
self of it to make the remittance for which he obtained it.
The plaintiff asserted it by asking for a second bill, and the
defendant acquiesced in the truth of the assertion by giving
it, as he on two former occasions offered to do, and there was
no evidence to raise a doubt upon the fact of such loss, or
the slightest proof or presumption that it had been presented
and paid. The whole case proceeds upon the concession that
it had not been paid. The facts existing and presented to
the minds of the parties when the second bill was drawn
were these: The defendant had in his hands the plaintiff's
money, which he had paid for the draft obtained in July, and
the drawees in New York had in their hands the defendant's
money to the requisite amount and more, subject to his orders.

Surely the plaintiff was not obliged to lose the money he had thus paid, and the defendant to acquire it on account of the loss of the prior draft. The giving of the July draft was an equitable assignment of so much of the defendant's money to the plaintiff. It did not, it is true, create a privity of contract between the plaintiff and the drawees, but the draft was a transfer enforceable in equity, in the absence of other remedies for its recovery, and it was a sufficient consideration for the duplicate draft.

The drawees continued, so far as the evidence shows, in good credit, and no reason appears to have existed why the plaintiff was not as willing to trust them during the time it would take to collect another sight draft as he had been in July, when the first draft was given. They had in their hands belonging to the defendant much more than the amount of the draft, which remained with them at the time of their failure. Under these circumstances the defendant gave the plaintiff the draft in suit of precisely the same tenor as the former one, and containing no qualification or limitation in its terms of the rights and obligations of the parties, unless one is to be implied from the similarity of the two bills, and the word duplicate which was written across the face of the last one. The Supreme Court implies from that word, and the identity of the terms of the bills, a very special agreement. They would make the bill effectual as an order for the money, if the drawees would pay it, but a denial of the defendant's liability as drawees if they should not pay it. It would have been competent, no doubt, for the parties to make such an agreement; but there were no known circumstances suggesting its necessity, and there was certainly no direct evidence that such an agreement was made, and I think none from which it could be implied. The word duplicate had, under the circumstances, very much the same effect as the words of reference inserted, where bills of exchange are drawn in sets. The different parts are precisely alike, and the drawee is requested, in each, to pay the amount mentioned, if the others, which are referred to by their numbers, are unpaid. This is necessary to prevent each

part being negotiated and presented and paid as an inde-
pendent bill. But either one of the separate parts may be
used, as a perfect and available bill against the drawers as
well as the drawees. In my opinion it is to be intended, as
the fact undoubtedly was, that the word duplicate was inserted
for the purpose of preventing the payment of both bills. It
might happen that the first one would be presented and paid
before the second one could be presented. It was supposed
to be lost; but it was not proved to have been destroyed;
and it was a reasonable and necessary precaution to take, to
apprise the drawees, on the face of the second bill, that it
was the duplicate of another one, so that they should not pay
it if that other one had been presented and paid. The case
is not precisely similar I admit, to that of sets of bills, all
drawn at the same time, for the first bill in this case con-
tained no reference to any others. It might happen that the
first bill had been negotiated and had come into the hands
of a *bona fide* holder, and been withheld from presentment
under circumstances which would excuse the delay. In that
case if it should be presented and protested after the one
marked duplicate had been paid, the defendant might be
made liable as drawer, after his funds had been used to pay
the duplicate. The probability of this was very remote.
The possibility of its occurrence might have justified the
defendant in requiring an indemnity before drawing another
bill; but instead of requiring such an indemnity he con-
sented to draw the present bill, embracing in its terms the
usual obligations of a drawer, and taking only the precau-
tions, by inserting the word duplicate, to provide that both
bills should not be paid by the drawees and be charged to
his account. By doing this he impliedly waived other pre-
cautions, such as might be suggested by the apprehension of
the subsequent presentment and protest of the first bill by
a *bona fide* holder under circumstances which would charge
him as a drawer. The theory by which the Supreme Court
sustained the nonsuit is abstruse and unnatural. It supposes
an arrangement which the circumstances of the case, existing
at the time the bill in suit was drawn, did not suggest, and

which did not become pertinent or applicable until after the happening of the event, which was unexpected by both parties, the failure of the drawees. What is more important, it supposes a contract which is hostile to the legal effect of the instrument which the defendant signed, and which, as I have just said, there is no evidence to support. It gives an effect to the word which was inserted to show that another bill of the same purport had been drawn, and, apparently, to prevent the drawees from paying both, which would make the bill an assignment of the fund, with a provision that it should be without recourse to the defendant, though neither of the bills should be paid. Hence, I am in favor of reversing the judgment and ordering a new trial.

I do not perceive that the facts which I have considered sufficient to sustain the action were at all in dispute; and it seems to me, therefore, that if they should appear to be equally certain upon another trial the judge ought to direct a verdict for the plaintiff.

Judgment reversed.